FILED

2016 Oct-12  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| LUANNA POAG, WILLIAM ROBERT HARRY, and MIRIAM ANN HANEY, ) ) ) ) | |
| Plaintiffs, ) ) | |
| vs. ) ) | Civil Action No. 3:16-cv-1088-CLS |
| CITY OF FLORENCE, ALABAMA,  GUY LAMBERT, JEFF STANFIELD, and JOHN HAMM, ) ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Luanna Poag, William Robert Harry, and Miriam Ann Haney, filed

a First Amended Complaint on August 12, 2016, against defendants City of Florence,

Alabama ("the City"), and Guy Lambert, Jeff Stanfield, and John Hamm, all of whom

are police officers for the City.[1] The First Amended Complaint asserts claims pursuant

to 42 U.S.C. § 1983 for unlawful search and seizure (Counts I and II), unlawful arrest

---

[1] Doc. no. 17 (First Amended Complaint).  The caption of the First Amended Complaint also lists four additional defendants:  Zach Maxwell; Dustin Key; Jason Novak; and Eric Pollard.  *See id.* at 1.  Even so, the body of the First Amended Complaint does not contain any allegations against those defendants.  The court will presume that, when drafting the First Amended Complaint, plaintiffs' attorney simply copied the heading from the original Complaint, which did name those additional defendants, *see* doc. no. 1 (Complaint), but that plaintiffs did not intend to assert any claims against those four additional defendants in the First Amended Complaint.  That presumption is further supported by the fact that plaintiffs moved to voluntarily dismiss all claims against Maxwell, Key, Novak, and Pollard on August 12, 2016, the same date the First Amended Complaint was filed.  *See* doc. no. 16 (Motion to Voluntarily Dismiss Certain Defendants).

and detention (Count III), excessive force (Count IV), and failure to train (Count V), as well as supplemental state law claims for false arrest/false imprisonment (Count VI) and trespass (Count VII, improperly labeled as "Count V").[2]   The case presently is before the court on defendants' motion to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[3]   Upon consideration of the motion, briefs, and First Amended Complaint, the court concludes that the motion is due to be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   This rule must be read together with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).   While that pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).   As the Supreme Court stated in *Iqbal*:

A pleading that offers "labels and conclusions" or "a formulaic recitation

---

[2] *See* doc. no. 17 (First Amended Complaint).

[3] Doc. no. 20.

of the elements of a cause of action will not do." [*Twombly*, 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id*., at 557.

To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id*., at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*., at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*., at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*., at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id*., at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

3

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While *legal conclusions* can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations*, *a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis and alterations supplied).

## II. ALLEGATIONS OF PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Luanna Poag and Robert Harry reside together at 2404 Chickasaw Drive: an address that is located in an upper-middle-class, single-family, low-crime, residential neighborhood in Florence, Alabama.[4]  Chickasaw Drive is approximately three-quarters of a mile in length, and there are approximately fifty-five homes on the street.  As is usual in urban areas, odd-numbered and even-numbered properties are located on opposite sides of the street.[5]  There are "more than twelve" homes either within or bordering what plaintiffs refer to as "the '2400 block of Chickasaw Drive.'"[6]  The house occupied by plaintiffs Poag and Harry is an all-brick, ranch-style home of approximately 1,500 square feet, and it is situated on a lot of approximately 138 feet by 125 feet.[7]  The home has a front porch with an entrance and a large picture window

---

[4] Doc. no. 17 (First Amended Complaint) ¶¶ 5, 7, 25.

[5] *Id.* ¶ 26.

[6] *Id.* ¶¶ 27-28.

[7] *Id.* ¶ 30.

facing Chickasaw Drive, and an attached carport located on the northern side.[8]  The

distance from the northwest corner of the carport to the northern property line is

approximately forty feet.[9]

An "older couple" resided at 2410 Chickasaw Drive on July 4, 2014.

35.  At all times relevant to this matter, an older couple resided at
2410 Chickasaw Drive, in Florence, Alabama.  The 2410 property is
located north of the Poag/Harry property.  The lot of the 2410 property
is approximately 138 feet by 125 feet with a brick, ranch-styled home
located on the lot.  The 2410 residence has a front porch and entrance that
face Chickasaw Drive.  The distance from the northwest corner of the
2410 residence to the Poag/Harry property line is approximately 75 feet.

36.  Thick trees, bushes, and an intermittent fence physically
separate the 2410 property from the Poag/Harry property.  Any view of
the Poag/Harry home, including the carport, from the front porch of the
2410 residence, would be obstructed by the structure of [the] 2410 home
itself and/or by the trees, bushes, and an intermittent fence located along
the property line. It is not possible for someone who is sitting on the front
porch of the 2410 residence to observe any activities in the Poag/Harry
home, carport or curtilage.

Doc. no. 17 (First Amended Complaint), ¶¶ 35-36 (alteration supplied).

Plaintiff Miriam Ann Haney is a friend of both Poag and Harry, and she was an

overnight guest in their home on July 4, 2014.[10]  The three plaintiffs were inside the

home during the afternoon hours of that national holiday, preparing for a holiday cook-

out.  The weather was clear, and the home and surrounding areas were lit by the

---

[8] *Id.* ¶ 31.

[9] *Id.* ¶ 32.

[10] Doc. no. 17 (First Amended Complaint) ¶ 11.

afternoon sun.[11]

38.  In the afternoon hours on July 4, 2014, as Ms. Haney and Ms. Poag were sitting on the couch talking, Ms. Haney looked through the "storm door" of the carport entrance and noticed men walking around inside the carport of the Poag/Harry home.  Ms. Haney informed Ms. Poag of what she saw.

39. Ms. Poag, who was unarmed, and was wearing sweat pants and a t-shirt, opened the door that led to the carport.

40.  Upon opening the door, Ms. Poag was immediately faced with two armed police officers from the City of Florence, Defendants Guy Lambert and Jeff Stanfield, who had guns pointed directly at her.  With guns drawn, Defendants Stanfield and Lambert began yelling commands and orders at Ms. Poag, demanding that she leave the interior of her home and place her hands on the wall of the carport.  One of the officers, either Defendant Lambert or Defendant Stanfield, was in "swat" type attire and had a large assault rifle pointed directly at Ms. Poag.  The other officer, either Defendant Lambert or Defendant Stanfield, was in a regular police uniform and had his service weapon pointed directly at Ms. Poag.

41.  When Ms. Poag went to the door, she was not armed, nor did she appear to be armed.  Ms. Poag was not injured, nor did she exhibit any signs of being injured.  She was not, initially, nervous or fearful, nor was she acting in a nervous or fearful manner.  She was not dressed in an unusual manner for the time of day or season.  She did not attempt to evade the interaction with Defendants Stanfield and/or Lambert, nor was she acting in an evasive manner.  Ms. Poag was not intoxicated, nor was she acting in an intoxicated manner.  Ms. Poag was not having an emotional breakdown or psychotic break, nor was she behaving in an emotional or psychotic manner.  Ms. Poag was not having a heart attack or other medical emergency, nor did she appear to be having a heart attack or other medical emergency.

42.  Upon seeing Defendants Stanfield and Lambert in her carport

_____

[11] *Id.* ¶ 37.

and even after being confronted by Defendants Stanfield and Lambert at gunpoint, Ms. Poag did not lock the doors, shut the curtains, slam the door in the officers' faces, refuse to answer a ringing phone, shout or cuss, instruct anyone in the house to run or hide, attempt to discard evidence of some crime, or attempt to flee.  She saw Defendants Lambert and Stanfield in her carport and did nothing more than open the carport door and comply with their forceful and armed demands.

*Id.* ¶¶ 38-42.

Officers Lambert and Stanfield did not possess, or present Poag with, a warrant before asking her to leave the interior of her home, and they did not obtain her consent before requiring her to leave.[12] They also did not

> inform Ms. Poag they had received a call about activities on the Poag/Henry property; ask Ms. Poag for identification; briefly question her about the events of the day; ask whether she heard a gunshot; ask whether she, or anyone else in the home, had fired a gun on the property or in the home that day; ask whether she, or anyone in the Poag/Harry home had been shot; inquire about whether she, or anyone in the home, was in need of law enforcement assistance; inquire about whether she, or anyone in the home, was in need of medical assistance or emergency medical services; ask whether she, or anyone in the home, had shouted anything such as "help murder."

*Id.* ¶ 44.  Once Lambert and Stanfield detained Poag at gunpoint in her carport, Poag was not free to leave.[13]

46.  After hearing the commotion, Plaintiffs Harry and Haney both came to the door that lead [*sic*] to the carport of the Poag/Harry home.  As with Ms. Poag, Plaintiffs Harry and Haney were immediately faced with two armed police officers from the City of Florence, Defendants Guy

---

[12] *Id.* ¶ 43.

[13] *Id.* ¶ 44.

Lambert and Jeff Stanfield, who had guns pointing directly at them. With guns drawn, Defendants Lambert and Stanfield began barking orders at Plaintiffs Harry and Haney, demanding that they leave the home and place their hands on the wall of the carport next to where Ms. Poag was already detained.

47.  When Plaintiffs Harry and Haney went to the door, neither were [*sic*] armed, nor did either appear to be armed.  Neither was injured, nor did either exhibit any signs of being injured.  Neither was initially nervous or fearful, nor was either acting in a nervous or fearful manner. Neither was dressed in an unusual manner for the time of day or season. Neither attempted to evade the interaction with Defendants Stanfield and/or Lambert, nor was either acting in an evasive manner.  Neither was intoxicated, nor was either acting in an intoxicated manner.  Neither was having an emotional breakdown or psychotic break, nor was either behaving as though he or she were having an emotional or psychotic episode.  Neither was having a heart attack or any other medical emergency, nor did either give the appearance of having a heart attack or any other medical emergency.

48.  Upon discovering there were police officers on the Poag/Harry property, and even after Plaintiff Poag had already [been] forced from the home and detained at gunpoint, neither Plaintiff Harry nor Plaintiff Haney locked the doors, shut the curtains, slammed the door in the officers' faces, refused to answer a ringing phone, shouted or cussed, instructed anyone in the house to run or hide evidence of some crime, or attempted to flee.  They merely responded to a commotion in the carport and complied with Defendant Stanfield and Lambert's forceful and armed demands.

*Id.* ¶¶ 46-48 (alteration supplied).

Officers Lambert and Stanfield did not possess, or present Harry and Haney with, a warrant before asking them to leave the interior of the home, and they did not

obtain Harry and Haney's consent before requiring them to leave.[14]  As with Poag, the officers did not provide Harry or Haney with any information about why they were present in the home carport, and they did not ask any questions to determine whether anyone in the home had been shot or needed police assistance.[15]  Once Lambert and Stanfield detained Harry and Haney at gunpoint in the carport, they were not free to leave.[16]

Soon after Officers Lambert and Stanfield entered the carport and detained plaintiffs, defendant John Hamm arrived on the scene with four other officers, who "took positions" on the property.[17]  The seven armed officers surrounded plaintiffs,[18] even though none of them observed any suspicious or illegal activity, had a physical description of any potential suspects or victims, asked for clarification as to the address of the 911 call that had resulted in their dispatch to Poag and Harry's property, attempted to independently corroborate the statements made by the 911 caller, observed any guns, or saw or heard anything that would lead them to believe that anyone in the residence was in need of emergency assistance.[19]  Officer Hamm then

---

[14] *Id.* ¶ 49.

[15] *Id.* ¶ 50.

[16] Doc. no. 17 (First Amended Complaint) ¶ 50.

[17] *Id.* ¶ 52. The four other officers who arrived with defendant John Hamm were Zach Maxwell, Dustin Key, Jason Novak, and Eric Pollard — the same officers who were named in plaintiff's original Complaint but omitted from the First Amended Complaint. *See supra,* note 1.

[18] Doc. no. 17 (First Amended Complaint) ¶ 52.

[19] *Id.* ¶ 53.

entered the carport and joined Officers Lambert and Stanfield in their detention of plaintiffs.[20]

"Shortly thereafter," Officers Stanfield and Hamm moved from the carport to the interior of the home and searched the home, with their weapons drawn, for approximately five minutes.[21]  They did not have a warrant to conduct such a search.[22]

In addition, plaintiffs allege that:

58.  At some point after the incident, Plaintiffs learned a neighbor had called 911 on July 4, 2014 to report hearing what sounded like a gunshot and someone saying the words "help murder."  The caller, who was the older male resident of the 2410 residence, acknowledged that he was the individual who called 911 on July 4, 2014.  Because he was aware of "Neighborhood Watch" signs, he called 911 to report what sounded like a high caliber gunshot, and a woman utter the words "help murder."  He stated the sounds came from 50 feet away from where he was sitting on the front porch of the 2410 property.  He called 911 to report what he heard, **even though he thought the sounds could have come from the television set**.  He admitted he was perplexed.  He also informed the undersigned that with the exception of speaking with the undersigned, her deceased father, Robert Gonce, and the 911 dispatcher, he had only spoken to one (1) police officer, who he believed was a sergeant.  He stated he reported to that officer the very same information he reported to the undersigned and to Mr. Gonce.

59.  On July 4, 2014, the 911 caller's report was based solely on what the 911 caller reported, that was solely "auditory."  The 911 caller never observed anything.  Rather the 911 caller reported to the undersigned that he heard two things:  a gun shot and the words "help murder," and **he thought those sounds could have come from a television set**.

---

[20] *Id.* ¶ 54.

[21] *Id.* ¶ 55.

[22] *Id.* ¶¶ 56-57.

60.  No one else in the neighborhood, not even the 911 caller's spouse, reported hearing a gunshot or the words "help murder" on July 4, 2014.  No one, not even the 911 caller's spouse, could corroborated [*sic*] the 911 caller's statements about what he heard.

Doc. no. 17 (First Amended Complaint), ¶¶ 58-60 (emphasis in original, footnotes omitted).

### III. DISCUSSION

**A.   Constitutional Claims Against The Individual Officers**

The individual defendants — Florence Police Officers Guy Lambert, Jeff Stanfield, and John Hamm — assert that they are entitled to qualified immunity for plaintiff's constitutional claims.   The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine requires that a defendant claiming immunity must initially "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).  That threshold inquiry is easily satisfied here, as the individual defendants were engaged in law enforcement functions

on the date and at the time of the events that led to plaintiffs' complaint.

The next step generally is to apply a two-part test. The first step is for the court to determine whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If that question is answered affirmatively, the court will proceed to analyze the second aspect of the two-part inquiry: *i.e.*, "whether the right was clearly established." *Id.* Strict adherence to the order of those two inquiries is not required, however. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). Instead, in appropriate cases, it is within a district court's discretion to assume that a constitutional violation occurred in order to address, in the first instance, the question of whether such a *presumed violation* was "clearly established" on the date of the incident leading to suit. *Id.*

When determining whether the unlawfulness of an official's actions was "clearly established," the pertinent question is whether the state of the law on the date of the defendant's alleged misconduct placed defendants on "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002) (alteration supplied); *Williams v. Consolidated City of Jacksonville,* 341 F.3d

12

1261, 1270 (11th Cir. 2003) (same).

The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff. *Hope*, 536 U.S. at 739. Instead, in order for a constitutional right to be deemed "clearly established,"

> its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope*, 536 U.S. at 741 (alteration in original). An officer can receive "fair notice" of his or her unlawful conduct in various ways.

> First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.* This kind of case is one kind of "obvious clarity" case. For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.
>
> Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.* When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. *See Marsh* [*v. Butler County, Ala.*]*,* 268 F.3d [1014,] 1031-32 n.9 [11th Cir. 2001]. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that

determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.* That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies. On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson,* 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original, alterations supplied). *See also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

## 1.    Search and seizure claims

14

Plaintiffs assert that defendants violated their Fourth Amendment rights when they: (1) "entered the carport and curtilage of the Poag/Harry home without consent, a warrant, or exigent circumstance and without probable cause" (Count I);[23]   (2) "entered the interior of the Poag/Harry home without consent, a warrant or exigent circumstance and without probable cause" (Count II);[24] and (3) "entered Plaintiff Poag's and Plaintiff Harry's home and arrested and detained at gunpoint Plaintiffs Poag, Harry, and Haney without consent, a warrant or exigent circumstance and without probable cause."[25]

As an initial matter, the court observes that the carport of Poag and Harry's home was entitled to the same Fourth Amendment protection as the interior of the home itself.  "A home's curtilage, '[t]he private property immediately adjacent to a home[,] is entitled to the same protection against unreasonable search and seizure as the home itself.'"  *United States v. Noriega*, 676 F.3d 1252, 1262 (11th Cir. 2012) (quoting *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006)) (alterations in original).

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home [or its curtilage] without a warrant are presumptively unreasonable."

---

[23] Doc. no. 17 (First Amended Complaint) ¶ 81.

[24] *Id.* ¶ 83.

[25] *Id.* ¶ 35.

*Payton v. New York,* 445 U.S. 573, 586 (1980) (alteration supplied).

> But we have also recognized that this presumption may be overcome in some circumstances because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"[*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)]; *see also Michigan v. Fisher*, 558 U.S. [45], [47], 130 S. Ct. 546, 548, 175 L. Ed. 2d 410 (2009) (*per curiam*).  Accordingly, the warrant requirement is subject to certain reasonable exceptions.  *Brigham City, supra*, at 403, 126 S. Ct. 1943.

> One well-recognized exception applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment."  *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *see also Payton, supra*, at 590, 100 S. Ct. 1371 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant").

*Kentucky v. King*, 563 U.S. 452, 459-60 (2011) (first, fifth, and sixth alterations in original, other alterations supplied).

One exigency that will justify a warrantless search is the "emergency aid" exception.  Under that exception, "law enforcement officers may enter a home [or its curtilage] without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Brigham City*, 547 U.S. at 403-04 (alteration supplied) (citing *Mincey*, 437 U.S. at 392; *Georgia v. Randolph*, 547 U.S. 103, 118 (2006)).  The police officers' subjective intent is irrelevant; instead, the officers must only demonstrate "an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid."  *Fisher*, 558 U.S. at 47

(alteration in original, citations and internal quotation marks omitted).[26]

Here, defendants Lambert, Stanfield, and Hamm assert that they were justified by exigent circumstances when they stepped onto plaintiffs' carport and, thereafter, entered into both the sunroom and the home itself, as well when they detained plaintiffs. They rely primarily on the Eleventh Circuit's decision in *United States v. Holloway*, 290 F.3d 1331 (11th Cir. 2002). The pertinent facts of that case were stated as follows:

> At 10:22 p.m. on August 4, 1999, Officer Norman Bernard of the Alexander City Police Department received a dispatch from a 911 operator to investigate a report of gunshots and arguing emanating from 3785 Washington Street. Officer Bernard proceeded immediately to the location of the disturbance. En route, the officer received a second dispatch from the 911 operator indicating the caller was reporting continued gunshots and arguing. Officer Bernard arrived at the designated address at approximately 10:29 p.m., within a minute of the second dispatch from the emergency operator. Providing back-up in a separate patrol car was Officer Marcus Billips, who also responded to the emergency dispatch.

> Upon arrival, Officer Bernard pulled into the driveway of the residence located at 3785 Washington Street, a mobile home occupied by Appellant. The officer illuminated the residence with his headlights and spotlight. On the porch of the residence were Appellant and his wife, Lena Holloway. Due to the high-risk nature of the 911 call, Officer Bernard drew his service weapon as he exited his vehicle. From behind

---

[26] There technically also remains a requirement that a search conducted under emergency circumstances be supported by probable cause. *United States v. Holloway*, 290 F.3d 1331, 1337-38 (11th Cir. 2002). That inquiry, however, is effectively subsumed by the emergency inquiry. As the Eleventh Circuit has held, "in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger." *Id.* at 1338.

17

his car door, Officer Bernard instructed Appellant and his wife to raise their hands into view.  Appellant complied; his wife did not.  As directed, Appellant stepped off the porch and walked towards Officer Bernard and Officer Billips.  As Appellant proceeded towards the officers, a third individual, later identified as neighbor Mike Machado, emerged from behind a horse trailer parked in the yard.  The neighbor also was ordered to raise his hands and walk towards the officers.  Both Appellant and his neighbor were instructed to lie on the ground facing away from the officers, their palms facing up.

Although the two men were compliant, Mrs. Holloway refused to leave the porch, and instead sat down on a chair.  Despite several verbal commands, Mrs. Holloway refused to move.  Suddenly, a child appeared in the doorway of the residence.  The child was ordered back into the house.  Ultimately, because of Mrs. Holloway's unresponsiveness, Officer Bernard threatened to employ his pepper spray.  Finally, with encouragement from Appellant, Mrs. Holloway stepped off the porch, but refused to raise her hands.  By this time, Sergeant Randy Walters, who had arrived on the scene to provide additional support, stepped in to secure Mrs. Holloway.

After Mrs. Holloway was placed under control, Officer Bernard turned his attention to Appellant.  The officer handcuffed Appellant and quickly patted him down to see if he was concealing a weapon.  Officer Billips then engaged in the same procedure with respect to Mr. Machado.  Once they were secured, the two men were placed separately in the officers' patrol cars.  Altogether, approximately ten minutes elapsed from the time the officers arrived on the scene to the time those present were secured.

Having placed Appellant safely into his patrol car, Officer Bernard approached the residence to check for victims and weapons on the premises.  In doing so, the officer observed several beer cans strewn about the yard and porch.  As he stepped onto the porch, Officer Bernard saw a shotgun shell on top of the picnic table.  Glancing around for a corresponding weapon, the officer located a model 870 Remington shotgun leaning against the side of the mobile home, approximately three feet from where Appellant had been standing when the officers first

arrived.  The safety was disengaged.  Additional shotgun shells, two expended and one live, were found lying in the grass by the side of the residence.  Officer Bernard locked the weapon in the trunk of his patrol car and returned to the house to continue his search for victims and investigate the disturbance.  No victims were found.

After ensuring that everyone on the scene was safe, Officer Bernard approached Appellant to inform him of the 911 call and to explain the officers' reasons for securing those present on the premises.  As Officer Bernard was explaining the officers' actions, Appellant interrupted to describe what had transpired earlier that evening.  According to Appellant, the commotion began when three males standing on the railroad tracks behind Appellant's mobile home started throwing rocks at his house and horses.  In an effort to ward off the men, Appellant fired his shotgun into the air above the railroad tracks.

In light of his conversation with Appellant, Officer Bernard left to speak with Sergeant Walters.  According to Sergeant Walters, Appellant's account of the evening's events matched an account given by Mrs. Holloway.  Based on this information, Sergeant Walters determined there was sufficient cause to arrest Appellant.  Appellant was then placed under arrest by Officer Bernard at approximately 11:05 p.m., 36 minutes after the officers first arrived on the scene.

*Holloway*, 290 F.3d at 1332-33 (footnote omitted).  Holloway ultimately was indicted by a federal grand jury for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[27]  He moved to suppress any evidence of the firearm seized on

[27] That statute provides, in pertinent part, that:

It shall be unlawful for any person –

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[]

. . . .

19

the property, claiming that the search of his home violated the Fourth Amendment. The district court denied the motion to suppress, and the Eleventh Circuit affirmed that decision on appeal. *Holloway*, 290 F.3d at 1333, 1341.

The Eleventh Circuit found in the *Holloway* case that the officers "did not violate the Fourth Amendment when they conducted a warrantless search of [Holloway's] home." *Id.* at 1338 (alterations supplied). When the officers arrived at the Holloway residence, everything they observed was consistent with the dispatch reports of arguing and gunshots. *Id.* They were, therefore, justified by the exigent circumstances presented in entering the home without a warrant to conduct a search. *Id.* It was irrelevant that the officers did not ultimately locate any victims, because they "reasonably believe[d] an emergency situation necessitate[d] their warrantless search." *Id.* at 1340 (alterations supplied). The officers also were justified by safety concerns in temporarily securing the individuals present at the Holloway home prior to conducting their search, because they had "reasonable cause to believe they were entering a volatile and potentially dangerous situation based on the prior report of gunshots." *Holloway*, 290 F.3d at 1340. Finally, once the officers were lawfully

---

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1) (alteration and ellipsis supplied).

present inside the home, they were justified in seizing Holloway's gun, which was in plain view. *Id.* As such, "neither the emergency search of [Holloway's] residence nor the seizure of the shotgun violated the Fourth Amendment's proscription against unreasonable searches and seizures." *Id.* at 1341 (alteration supplied).

This court agrees with defendants that the *Holloway* decision precludes a finding that plaintiffs' Fourth Amendment protections against unlawful searches and seizures were violated. As in *Holloway*, the officers in this case received a dispatch based upon a 911 call indicating a potentially life-threatening situation, including a report of gunshots and a cry of "help murder."[28] Therefore, even though Officers Lambert and Stanfield did not possess a warrant, their entry into the carport of the house occupied by Poag and Harry was justified for the purpose of determining whether anyone inside posed a threat, was injured, or needed police assistance. The subsequent, warrantless entry of Officers Stanfield and Hamm into the interior of the home itself was justified for the same reason. Finally, the officers were justified in temporarily detaining plaintiffs until they knew whether plaintiffs, or anyone else who might be inside the home, presented a threat to their own safety or to the safety of others.

---

[28] Plaintiffs focus on the fact that the neighbor who placed the 911 call acknowledged that the gunshot noises he heard could have emanated from the television. But it appears that the neighbor only made that acknowledgment *after the fact*, during an interview with plaintiffs' attorney. There is no indication that the neighbor made any such acknowledgment during his 911 call, or that the officers had any other reason to believe that the reported gunfire actually might have been television noise.

Because the defendant officers were justified in their warrantless entry into both the carport and the home itself, and in their temporary detention of plaintiffs, no Fourth Amendment violation occurred.  At the very least, in light of *Holloway,* defendants did not violate any of plaintiffs' *clearly established* Fourth Amendment rights. Accordingly, the individual defendants are entitled to qualified immunity, and plaintiffs' Fourth Amendment unlawful search and seizure claims are due to be dismissed.

## 2.     Excessive force claim

Plaintiffs also contend that defendants' detention of them while they conducted a search of the premises constituted excessive force.[29]  "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 394-95

---

[29] Doc. no. 17 (First Amended Complaint) ¶ 87 (alleging that defendants "entered Plaintiff Poag's and Plaintiff Harry's home and arrested and detainment [*sic*] Plaintiffs Poag, Harry, and Haney at gunpoint, which was an unreasonable and excessive use of force, and was without consent, a warrant or exigent circumstance and without probable cause").  Defendants assert that the excessive force claim should not be considered independently, and, indeed, the Eleventh Circuit has held that claims for excessive force used during an *unlawful* arrest are subsumed by the underlying unlawful arrest claim.  *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) ("Under this Circuit's law, however, a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim.").  However, if, as here, the underlying arrest or seizure has been deemed to be constitutional, the excessive force claim should be considered independently.  *See Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) ("Once summary judgment is granted in Ferraro's favor on the wrongful arrest claim, Lee's claim that the officer used excessive force must be analyzed independently.').

(1989)).  The reasonableness inquiry is an objective one:  "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397 (citations omitted).  In other words, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* (citations omitted) (alteration supplied).

The court may consider a number of factors when determining whether the force applied was "reasonable" under the circumstances, including:  (1) the "severity, or lack of severity, of the alleged crime in issue," *id.* at 396; (2) "whether the person against whom the force was used posed an immediate threat to the safety of the police or others," *id.*; (3) "the need for the application of force," *Jackson v. Sauls*, 206 F.3d 1156, 1170 n.18 (11th Cir. 2000); (4) "the relationship between the need and the amount of force used," *id.*; (5) "the extent of the injury inflicted," *id.*; (6) "whether the force was applied in good faith or maliciously and sadistically," *id.*; (7) "the possibility that the persons subject to the police action are themselves violent or dangerous," *id.*; (8) "the possibility that the suspect may be armed," *id.*; (9) "the number of persons with whom the police officers must contend at one time," *Jackson*, 206 F.3d at 1170 n.18; and (10) "whether the suspect was resisting or fleeing." *Id.*

"Use of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at 396) (alteration supplied).   "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The only use of force plaintiffs allege is defendants' use of guns to secure plaintiffs in the carport while they determined whether anyone in the house either posed a danger to the officers or needed assistance.  It is important to note that defendants did not shoot plaintiffs, or even touch plaintiffs with their guns; instead, they simply pointed the guns at plaintiffs in order to coerce their cooperation.  The Eleventh Circuit has held that "an officer's drawing a weapon and ordering a person stopped to lie on the ground does not necessarily constitute excessive force during an investigatory stop." *Jackson*, 206 F.3d at 1171-72.  There is no reason to conclude, under the circumstances presented here, that defendants' use of guns in a show of force was disproportionate to the demands of the situation.  Defendants did not know any whether crime had been committed, but the potential crimes reported to them by

dispatch included murder, the most violent of all crimes.  As such, it was reasonable for defendants to assume that plaintiffs might present an immediate threat to their own safety or the safety of others.  Defendants did not know whether plaintiffs were armed or otherwise dangerous, or whether they might attempt to flee.  Finally, plaintiffs were not injured during the conrontation, and there is no indication that defendants acted maliciously or sadistically.

In light of the foregoing circumstances, this court concludes that plaintiffs have not stated a viable claim for violation of their right to be free from excessive force.  At the very least, they have not stated a *clearly established* violation of that right.  As such, defendants are entitled to qualified immunity, and plaintiffs' Fourth Amendment excessive force claim is due to be dismissed.

## B.   Constitutional Claim Against the City of Florence

Plaintiffs assert the following to support their "Failure to Train" claim against the City of Florence:

> 89.  The City of Florence failed to train its police officers, including Defendants named herein, with the necessary training so that such officers could reasonably respond to incomplete, inaccurate and/or uncorroborated information provided by a 911 caller without an excessive show of force, excessive use of police presence, without drawing weapons, and without violating the civil rights of innocent citizens.
>
> 90. The City of Florence failed to provide its officers with the necessary training regarding exceptions to the warrant requirement, such [that] officers could reasonably respond to an incomplete, inaccurate

25

and/or uncorroborated information [*sic*] provided by a 911 caller without an excessive show of force, excessive use of police presence, without drawing weapons, and without violating the civil rights of innocent citizens.

91.  These failures to train render the City of Florence liable, as the duties assigned to police officers, and the need for more or different training is so obvious, and the inadequacy is so apparent, that the lack of training has and will likely continue to result in police officers violating the civil rights of innocent citizens.

92.  As a result of the City's conduct, Plaintiff have been caused to suffer injuries and damages, including embarrassment and humiliation, and to incur expenses.

Doc. no. 17 (First Amended Complaint) ¶¶ 89-92 (alteration supplied).

The City asserts that plaintiffs' claim is precluded by the Supreme Court's

decision in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).

There, the Court held that a municipality cannot be held liable under 42 U.S.C. § 1983

on a theory of *respondeat superior*:  in other words, "a municipality cannot be held

liable solely because it employs a tortfeasor."  *Id.* at 691.  Instead, a municipality may

be held accountable in damages for the conduct of a particular governmental actor only

when the plaintiff shows that execution of the municipality's official "policy" or

"custom" effectively was the cause of the injury complained of.  *Id.* at 694.  Thus, "[t]o

impose § 1983 liability on a municipality, a plaintiff must show:  (1) that his

constitutional rights were violated; (2) that the municipality had a custom or policy that

constituted deliberate indifference to that constitutional right; and (3) that the policy

or custom caused the violation." *T.W. ex rel. Wilson v. School Board of Seminole County*, 610 F.3d 588, 603 (11th Cir. 2010) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)) (alteration supplied).

This court agrees that plaintiffs cannot proceed with their claim against the City, because plaintiffs have not demonstrated any underlying violation of their constitutional rights. Accordingly, all of plaintiff's federal claims against the City of Florence are due to be dismissed.

## C. State Law Claims

Jurisdiction over plaintiffs' remaining claims — for false arrest/false imprisonment and trespass under Alabama law — was based upon 28 U.S.C. § 1367, the statute governing supplemental jurisdiction over state law claims. In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are "supplemental" to the federal claim. *See* 28 U.S.C. § 1367(a). The district court may decline to exercise supplemental jurisdiction when:

(1)    the claim raises a novel or complex issue of state law,

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)    *the district court has dismissed all claims over which it has original jurisdiction*, or

> (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (alteration and emphasis supplied). The Supreme Court added a gloss to this statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain*, the federal court *should decline* the exercise of jurisdiction by dismissing the case without prejudice.

*Id.* at 349-50 (emphasis supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent [now *supplemental*] jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon*, 484 U.S. at 350 n.7 (alterations supplied); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages *or even requires* dismissal of state claims") (emphasis supplied).

Here, all of plaintiff's federal claims have been eliminated, and there is no

independent basis for this court to assert jurisdiction over plaintiff's state law claims.[30] Accordingly, this court will decline supplemental jurisdiction over the remaining state law claims, and will exercise its discretion to dismiss those claims.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, defendants' motion to dismiss the claims asserted in plaintiffs' First Amended Complaint is GRANTED.  It is ORDERED that all of plaintiffs' federal claims (Counts I-V) are DISMISSED with prejudice. Plaintiffs' state law claims (Counts VI and VII) are DISMISSED, but without prejudice to plaintiffs' right to refile them in a state court.  Costs are taxed to plaintiffs.  The Clerk is directed to close this file.

DONE this 12th day of October, 2016.

_____
United States District Judge

---

[30] Plaintiffs cannot assert federal jurisdiction based on satisfaction of the requirements of the diversity statute, 28 U.S.C. § 1332, because complete diversity of citizenship is not present. *See* 28 U.S.C. § 1332(a)(1) (requiring that, in addition to an amount in controversy exceeding $75,000, the civil action must be between "citizens of different States").  All plaintiffs and defendants are citizens of Alabama.  *See* doc. no. 17 (First Amended Complaint) ¶¶ 5, 8, 11, 14, 17. 20, 23.